## Richmond

CITY OF LYNCHBURG, ET AL. v. CHESAPEAKE AND POTOMAC TELE-
PHONE COMPANY OF VIRGINIA.

March 16, 1959.

Record No. 4872.

Present, All the Justices.

The opinion states the case.

*Henry E. Ketner* (*F. Byron Parker; Leonard H. Davis*, on brief), for the appellants.

*John W. Riely* (*George D. Gibson; Joseph E. Blackburn; Hunton, Williams, Gay, Moore & Powell*, on brief), for the appellee.

BUCHANAN, J., delivered the opinion of the court.

This is an appeal of right, Const. of Va., § 156 (d), from an order of the State Corporation Commission granting to the Chesapeake and Potomac Telephone Company of Virginia (herein called the Company or the Virginia Company) an increase in rates, effective January 1, 1958, estimated to produce additional annual gross revenues of approximately $7,228,000, or additional annual net revenues of approximately $3,346,000. The question for decision is whether the action of the Commission was reasonable and just. Const. of Va., § 156 (f).

The Company is a Virginia corporation engaged in furnishing telephone communication services within and without this State. It is a wholly owned subsidiary of American Telephone and Telegraph Company. Its intrastate service is subject to the regulatory authority of the Commission, which is empowered to fix its rates and charges for intrastate service. Const. of Va., § 156; Code 1950, Title 56, Chapters 10, 15.

On July 17, 1957, the Company filed with the Commission its application for an increase in its rates and charges. It alleged that its

last application for a rate relief was filed in April 1954 and its present schedule of rates and charges for Virginia was prescribed by the Commission on June 30, 1954, based on a test period ended December 31, 1953; that since that time wage increases had amounted to $4.6 million; its plant investment had increased by 43%; that the increased cost of replacing obsolete and deteriorated plant units was causing a continuing attrition in its rate of earnings; that there was a strong demand for a wider range of local calling without a toll charge which would cost about $6 million; that interest rates and other money costs had increased sharply, and that additional revenues were required to enable the Company to continue to furnish adequate services. The rates and charges were set forth in an exhibit with the application, and with the application was filed the complete direct testimony of all witnesses that the Company expected to present in support of its application, copies of which were offered to any interested person.

The matter was set for hearing on October 15, 1957, and notice to the public duly published. At that time the City of Lynchburg and four other cities and the counties of Arlington and Fairfax, herein referred to as appellants, appeared in opposition to granting the increases sought by the Company. Other interested persons also appeared and were heard. The Company then presented its previously submitted testimony by its witnesses together with a number of exhibits giving methods and details of their calculations and conclusions. The staff of the Commission next presented through the chief accountant of the Commission, James H. Brown, the result of its study of the matter with accompanying exhibits showing the details of its work. The proceedings were then adjourned to December 5, 1957, to give time for cross-examining the Company's witnesses and the introduction of evidence in opposition to the increase.

Accordingly the hearing was resumed on December 5, at which time the Company presented evidence to the effect that after collective bargaining it had on November 27, 1957, made a new wage agreement with its employees effective November 24, to offset which it requested additional annual increased earnings of $1,270,000. The Company's witnesses were cross-examined by counsel for the appellants, who then presented their own evidence. This consisted of the testimony of Dr. Paul L. Howell, a consulting economist, and Charles E. Hammond, executive assistant to the Public Utilities Com-

mission of Arlington county, both of whom filed exhibits showing their calculations and conclusions.

The witnesses for the Company were J. Rhodes Mitchell, its vice-president; W. Bernard Thulin, its comptroller; William F. Johnson, its assistant vice-president; and William C. Bowles, its general commercial manager. In general they testified as to the growth of the Company, the wage situation, the need and cost of plant expansion, the financial position of the Company, the increase in the cost of debt capital, the necessary earnings on equity capital, and the proper proportion of each in the capital structure, what the company proposed to do, and the necessity for the increased rates applied for.

The Commission's chief accountant, Mr. Brown, presented an accounting study made by himself and seven members of his staff, and introduced exhibits showing various computations and the basic figures as to investment and earnings from which the Commission made its findings. He calculated a rate of return requirement of 5.99% and additional gross revenues of $3,296,423 without allowance for attrition, and a rate of 6.22% and additional gross revenue of $4,337,751 including attrition.

Dr. Howell, for the appellants, testified that a fair rate of return was 6% and that attrition should not be allowed. He gave his views as to cost of debt and cost of equity capital, the proper ratio of each in the capital structure, and as to an allowance of a tax credit by reason of the consolidated tax return made by the parent company. He filed exhibits showing his computations and his conclusions.

Mr. Hammond filed exhibits showing his computations for rate base, operating revenue and expenses, and the amount of increase that should be allowed.

On December 23, 1957, the Commission rendered its opinion and entered the order appealed from. The opinion, which was by Commissioner Hooker, concurred in by Commissioner Dillon, set forth the reasons for the Commission's action. Const. of Va., § 156 (f). Commissioner Catterall dissented and filed a separate opinion. He expressed the view that the question was simply how much revenue was required to enable the Company to attract new capital, the answer to which could only be stated as a number of dollars, which number was the same whether calculated from a reproduction cost rate base, an original cost rate base or no rate base. His conclusion was that a rate increase should be allowed sufficient to produce additional gross revenues of $2,770,000.

The majority opinion expressed a purpose not to depart from what it termed the long established policy of the Commission in fixing rates that were reasonable and just, but to follow the rule thus stated in *Norfolk* v. *C. & P. Telephone Co.*, (1951), 192 Va. 292, 301-2, 64 S. E. 2d 772, 777-8:

"Upon undertaking to fix rates for a public utility company of this character, the Commission must necessarily first ascertain (a) the value of the Company's property used and useful in the rendition of its intrastate service, (b) its annual gross revenues, and (c) its annual operating expenses. Upon accomplishing these objectives, it must then determine upon and set the percentage rate of return at such a figure as will afford the utility reasonable opportunity to earn a fair and just return on its investment."

The first inquiry of the Commission, speaking through the majority opinion, was to ascertain the level of earnings being produced by the existing rates. It accepted as reasonable, and in accord with previous practice of the Commission, a test period of six months ended September 30, 1957, as proposed by the Company. It then established a net intrastate original cost investment rate base as of that date under existing rates to be $201,032,000 (cost of plant $197,324,000 plus allowances for working capital $3,708,000). No question was raised as to the separation of the Company's plant into its intrastate and interstate components. In determining the intrastate base the figures used were from the report of the Commission's staff taken from the Company records.

The level of earnings on this net investment cost of plant under existing rates was then found to be $9,751,113. This was ascertained by deducting from net operating income of $10,795,113, as ascertained by the Commission's staff, the sum of $1,044,000, representing the effect of new wages ($578,000) and attrition in net earnings ($466,000).

This result showed the current level of earnings to be at the rate of 4.85% on the $201,032,000 investment. The Commission held this return to be too low and that an increase in rates was required. It turned then to an examination of the Company's proposal.

This proposal included a plan to eliminate certain toll charges for shorter distances and provide toll-free calling, or extended area service, between certain exchanges. The Commission found there was a widespread demand for this service throughout the State and approved the program. At the same time it found that this wider range

calling system would require an estimated outlay of $5,151,000, and would result in certain increases and decreases in revenues and expenses, but the overall effect would be to increase the earnings by an estimated amount of $54,058. It then found the net investment cost of telephone plant and allowances under the Company's proposed rates as of September 30, 1957, end of the test period, to be $206,253,-000, ascertained as follows:

| | |
|---|---|
| Net investment cost of plant under existing rates | $ 197,324,000. |
| Cost of additional plant to provide for wider range calling | 5,151,000. |
| Materials and supplies | 1,391,000. |
| Cash (approx. 20 days operating expense taking account of wage increase) | 2,387,000. |
| | $ 206,253,000. |

The increased rates requested by the Company were estimated by the Commission's staff to produce $7,227,716 of additional gross revenues. Adding this to $79,380,174 of operating revenues under existing rates resulted under the proposed rates in

| | | |
|---|---|---|
| Estimated operating revenues | | $ 86,607,890. |
| Estimated revenue deductions as calculated by the staff | | 72,857,135. |
| | | $ 13,750,755. |
| Add: Interest charged to construction | | 390,438. |
| | | $ 14,141,193. |
| Less: Net effect of new wages | $ 578,000. | |
| Attrition in net earnings | 466,000. | 1,044,000. |
| | | $ 13,097,193. |
| Add: Net earnings from wider range calling program | | 54,058. |
| Estimated level of earnings under proposed rates | | $ 13,151,251. |

These earnings of $13,151,251 would give a return of 6.38% on the estimated total investment cost of $206,253,000 under the proposed rates.

The Commission said: "In the light of the evidence of record, we conclude that the estimated 6.38' per cent rate of return shown above is not an unfair or unreasonable rate of return for the Company to earn on its intrastate rate base under present conditions. The estimated additional revenues to be produced by the initially filed rates is therefore approved. The further additional revenues of $1,270,000 requested by the Company should be and are denied."

It added in conclusion: "It is manifestly impossible for a utility to survive and give the service demanded by the business and social needs of the community unless it earns sufficient money to pay its operating expenses and to make the proper allowances for depreciation, and permit it to earn such reasonable return as will justify public investment in its securities and allow it to obtain the necessary finances to build the extensions needed by the advancing interests of the community."

The appellants make three assignments of error and allege that the Commission erred: (1) in that its action was contrary to the law and the evidence or without evidence to support it; (2) in that it adopted the actual "past year" debt ratio of the Bell System, contrary to the weight of authority and the interests of the public; and (3) in that its action has resulted in an unreasonable exercise of its authority, and was arbitrary and capricious.

■ In dealing with these assignments it is necessary to keep in mind the limitations upon our review which were recently stated.

"In performing the duties of promulgating and establishing reasonable and just rates and charges for transportation and transmission companies, the Commission exercises a legislative function. * *." *Norfolk* v. *C. & P. Telephone Co., supra,* 192 Va. at 299, 64 S. E. 2d at 776.

\* \* \*

"In fixing rates within the limits of what is confiscatory to the utility on the one side, and exorbitant as against the public on the other side, and thus definitely unfair and unjust to the telephone users, there is a reasonably wide area within which the Commission is empowered to exercise its legislative discretion. As it enjoys the full legislative power of the State within these bounds, the rate of return that it allows may not be changed or set aside as confiscatory or unreasonable and unjust unless it clearly evinces an abuse of legislative discretion." 192 Va. at 300, 64 S. E. 2d at 777.

\* \* \*

"* * (U)pon appeal from an order of the Commission fixing rates and charges for a *transportation or transmission* company, we in the first instance judicially review the proceeding. If, and only if, upon this purely judicial examination error of law be found in the record which requires reversal of the order are we empowered to substitute our order for 'such order as * * the Commission should have made * *.' * *."

\* \* \*

"* * 'We do not sit as a board of revision to substitute our judgment for that of the legislature, or of the Commission lawfully constituted by it, as to matters within the province of either.'" 192 Va. at 301, 64 S. E. 2d at 777. See also *Board of Supervisors* v. *Virginia Electric & Power Co.*, 196 Va. 1102, 1109-11, 87 S. E. 2d 139, 144-5.

The action of the Commission appealed from must be regarded as *prima facie* just, reasonable and correct. Const. of Va., § 156 (f).

Under appellants' first assignment of error, *i.e.*, that the Commission's action was contrary to the law and the evidence or without evidence to support it, they make a number of contentions, the first of which is that the rate of return allowed by the Commission, 6.38%, was excessive.

The ultimate objective in rate-making is to ascertain the amount of net earnings required to provide a fair and just return on investment. The regulatory body is dealing with private property invested in an enterprise which is allowed to be a monopoly that makes and sells without competition a product which the public has to buy. The elements involved are interdependent. Essentially they include the value of the investment, expressed as the rate base, the amount of money being earned, the amount that should be earned, and the increase, if any, needed to make up the difference. The rate of return is the percentage of the rate base required to produce the necessary annual earnings. In the language of the majority opinion, "the rate of return is primarily an exercise of informed judgment in the light of evidence and opinions of record."

"* * The rate of return on such 'fair value' which the utility company should be allowed to receive should be fair and just to the company and such as will make its securities attractive to investors when the company is prudently and carefully operated. * *." *Petersburg Gas Co.* v. *Petersburg,* 132 Va. 82, 89, 110 S. E. 533, 535. *Norfolk* v. *C. & P. Telephone Co., supra,* 192 Va. at 317, 64 S. E.

2d at 787; *Board of Supervisors* v. *Virginia Electric and Power Co.,* *supra,* 196 Va. at 1119, 87 S. E. 2d 139, 149.

There was no substantial question as to the rate base of $206,253,-000 as found by the Commission's staff and used by the majority in its conclusions. It represents net investment cost of telephone plant plus allowances for working capital. The appellants objected to the inclusion of cash in the latter item, amounting to $2,387,000, but the inclusion of a similar item was approved in the *Norfolk* case, 192 Va. at 306, 64 S. E. 2d at 780.

It would serve no useful purpose to attempt a detailed analysis of the figures and the procedures used by the witnesses in arriving at their results and their conclusions on the issues involved in the case. The differences in opinions and conclusions occur not with respect to the figures used, but in interpreting them and determining their place in the financial structure.

There was a variety of opinion expressed as to the proper rate of return. Johnson, the assistant vice-president of the Company, testified that "just over 7 per cent" was the minimum rate required under present conditions (based on a capital structure of 35% debt and 65% equity, with 3.5% as the cost of debt and 9% as cost of capital). Thulin, the Company's comptroller, testified that "the company believes that a return of at least 6.56 per cent is required to cope with the financial problems immediately ahead."

The chief accountant of the Commission testified that the indicated rate of return required was 5.99%. The majority of the Commission determined that 6.38% was the proper rate. Commissioner Catterall concluded that the rate should be 5.83% according to his method of approach. He applied this rate to a total investment of $209,232,275.

Dr. Howell concluded that the return should be "in the neighborhood of six per cent"; that a reasonable range might be from 5.90% to 6.10%. Mr. Hammond made no determination of a proper rate but in his calculations used an estimated return of 6.1%.

There is no dispute in the evidence on one point. It is agreed on all sides that the Company is entitled to some increase. The majority of the Commission held that the gross increase should be about $7,228,000, and the increased rates sought by the Company are expected to produce that amount. Commissioner Catterall calculated that an increase in rates sufficient to produce $2,270,000 additional gross revenue should be allowed. The Commission staff figured on

the basis of a 5.99% rate of return that gross additional earnings should be $3,296,423, or net earnings of $1,501,191 (the net being 45.54% of the gross). Dr. Howell concluded that a gross increase of $1,600,000 would be "just and reasonable" at this time. Hammond thought a gross increase of $1,015,000 was required.

Thus it appears that the differences of opinion relate not to the need of an increase but to what the amount of it should be. The appellants say the increase allowed by the Commission is excessive, mainly because of the way of its dealing with the items now to be discussed.

■ The Company claimed and was allowed a credit in the sum of $466,000 against its net operating income for the item called "attrition". The Commission explained the allowance of this item in this way:

"* * (T)he Company has forcefully pointed out to us that the higher cost of new and replacement plant results in a consistent and almost constant decline in its rate of earnings. It has demonstrated this both statistically and graphically. The result is that the Company never is able to earn for a substantial period the level of return contemplated by the Commission and rate cases follow one after another. This factor is called attrition."

Commissioner Catterall observed: "Since each telephone in service earns the same amount as every other telephone in its rate bracket, and since the cost of each telephone added today exceeds the cost of each telephone added yesterday, the earnings per telephone decline from day to day. The actual erosion cannot be exactly measured but we know that it exists."

He was of opinion that the use of the year-end investment value by the Commission, which he said would be much higher than the average investment during the period, provided some cushion against attrition. He would allow $400,000 in gross revenue for attrition.

Dr. Howell conceded the existence of attrition but contended that the use of the year-end rate base more than compensated for it. He presented tables to demonstrate that the use of the year-end rate base understated the true earnings on average capital for both the Company and the Bell System by more than .3%.

The allowance of a specific sum for this factor is admittedly new in Virginia, but that fact does not necessarily condemn it. It has been recognized and allowance made for it by utility commissions of other

States.[1] The Company's evidence shows that plant investment per telephone was $202 on December 31, 1946; $309 at the end of 1956, and $319 on May 31, 1957. The manner of arriving at the sum of $466,000 allowed by the Commission was shown by an exhibit filed by Mr. Thulin, in which he computed an average annual increase in investment cost of telephone since December 31, 1953 (the end of the test period in the next preceding rate case), then multiplied that sum by the 6% rate of return allowed by the Commission in the former case, which resulted in the claimed amount of net earnings sufficient to offset annual attrition.

The allowance of this sum of $466,000 increased the rate of return by .23% as calculated by the Commission's staff. Without it the rate of return would have been 6.15%. There is room for difference of opinion on this record as to whether the latter rate of return would not have been fair and just, but we cannot say that the allowance of this sum for attrition "evinces an abuse of legislative discretion." *Norfolk* case, *supra*, 192 Va. at 300, 64 S. E. 2d at 777. The use of a year-end rate base does not necessarily absorb this loss in addition to its function of offsetting "the lag in the return of earnings during the period between the time the money is invested and the time earnings are received," as referred to in *Board of Supervisors* v. *Virginia Electric & Power Co.*, *supra*, 196 Va. at 1121-2, 87 S. E. 2d at 151.

 Appellants object to including in the rate base, *supra*, the item of $8,856,000 for plant under construction; or if included, then they say the item of $390,438 of interest charged to construction should be increased to a sum resulting from applying an interest rate of 6.38% to correspond to the rate of return on the rate base ascertained by the Commission. Their position seems to be that both the plant under construction item and the interst item should be excluded from the computation. The contention appears to be without merit. Similar use of a sum for plant under construction was approved in the *Norfolk* case, where it was said that it "constitutes money invested in telephone plant under construction, but which was not then actually used because construction had not been completed." 192 Va. at 306, 64 S. E. 2d at 780. The item of interest charged to

---

[1] *Re New Jersey Bell Tel. Co.*, (1958), 24 P.U.R. 3d 181, 189; *Re Chesapeake & Potomac Tel. Co. of W. Va.*, (1958), 23 P.U.R. 3d, 344, 348; *Re Kentucky Utilities Co.*, (1958), 22 P.U.R. 3d 113; *Re Chesapeake & Potomac Tel. Co. of Md.*, (1958), 22 P.U.R. 3d 321, 329-30; *Re New England Tel. & Tel. Co.*, (N. H. 1957), 21 P.U.R. 3d 195, 200-1; *Re New York Tel. Co.*, (1957), 20 P.U.R. 3d 129.

construction was shown on the report of the Commission's staff and nothing is shown to indicate error in the figures.

Complaint is made that the Commission failed to consider or give effect to a saving resulting from the filing of a consolidated tax return by American Telephone and Telegraph Company, the parent and sole owner of the Virginia Company. Dr. Howell and Mr. Hammond testified that there should be a credit to earnings of approximately $553,000 for this item. It is shown that this item originated in an allocation to subsidiaries of the tax effect of interest paid on debt by the American Company for 1956, made by the National Association of Railroad and Utilities Commissioners (NARUC) and filed as an exhibit.

Comptroller Thulin for the Company testified that this item reflected income over and above that actually received by the Company, and that it would be fair to allow this adjustment only if the funds held by the American Company on behalf of the Virginia Company be also taken into consideration. He was referring to funds held by the American Company to service the financial needs of the Virginia Company. He testified that these funds amounted to $14,059,000 and that the cost of carrying them would more than offset the tax reduction. He testified that there was no disagreement in principle between the Company and the Commission staff on the question of this adjustment; that Mr. Brown, the Commission's chief accountant, reflected this tax adjustment in the statement of the Company's income but he also included these funds in the Company's investment account, which method he said was fair and just in that it considered both the plus and minus effects of these operations. He said that relating the amount of the tax reduction to the amount of the funds held available resulted in an allowance of 3.9% on the latter funds, which was not in excess of the cost of money.

Chief Accountant Brown filed an exhibit with his testimony in which he added $14,807,460 to the book capital of the company in ascertaining his indicated rate of return requirement. He explained that this was a sum proper to be allocated to the Virginia Company as its portion of the Bell System capital held in cash for the benefit of subsidiary companies. He then used the income tax saving as a credit (.26%) in stating his rate of return of 5.99%. Commissioner Catterall treated the $14,807,460 in the same way, adding it to the book capital to get the total investment, to which he applied a rate of 6.16% and from the product deducted $552,683 as the tax saving.

The Company argues that since a reasonable return on the $14,-807,460 more than offsets the theoretical tax saving, the Company suffered from the elimination of both sides of the adjustment instead of being benefited by it. The majority opinion did not refer specifically to this item but apparently included it in "other proposed adjustments" which it held to be "unrealistic since income, plant and expenses related to them are not included in the determination." We cannot say that this conclusion is without evidence to support it.

Appellants second assignment is that the Commission erred "in that it adopted the actual 'past year' debt ratio of the Bell System * * contrary to the weight of authority and not fair to the public." This has to do with the capital structure of the Bell System, which is the name given to the American Telephone and Telegraph Company, of which the Virginia Company is a part. The Virginia Company must get from the parent company the capital it needs for replacement and enlargement of its plant to meet the expanding demand for its services. The parent company obtains its capital by borrowing money and by the sale of its stock. The money so obtained is identified as debt capital and equity capital. Debt capital is usually cheaper than equity capital because the interest paid on debt is usually less than the dividends paid on stock, and hence the ratio of debt to equity in the capital structure of the Bell System is to be considered in determining the rate of return allowed the Virginia Company. For these reasons the witnesses both for the Company and for the appellants considered the Virginia Company as a miniature Bell System in making their calculations and conclusions as to the proper cost of capital. On that subject we said in the *Norfolk* case:

"* * The significance of the ratio of debt obligation to that of equity obligation has in this instance to do immediately with the Company for the Commission is fixing a just rate of return for appellee and the public it serves and not for the Bell System or the American Company. However, as it is by the means stated and as an integral part of the Bell System that appellee acquires needed capital from the American Company the ratio of debt to equity obligations of the Bell System (and of appellee as a unit therein) must be kept in mind when the Commission undertakes to fix a just rate of return." 192 Va. at 318, ł S. E. 2d at 787.

Since equity capital must be obtained from the sale of stock, the rate of return must allow earnings sufficient to attract investors.

The staff of the Commission made its calculation on the basis of the present capital structure of the Bell System of 35% debt and 65% equity, and used 3.5% as the cost of debt and 8% as the cost of equity (the latter being .09% more than the cost experienced by the Bell Company on its stock outstanding on December 31, 1956). This resulted in an over-all rate of return on total Bell capital of 6.43% as compared with the rate of 6.38% actually experienced for 1956. The problem works out thus: 35% debt at 3.5% equals 1.23%; 65% stock at 8% equals 5.2%; 1.23% plus 5.2% equals 6.43%. On the basis of the same precentages, but with a capital structure of 45% debt and 55% equity, the over-all rate of return would be 5.98%. It is thus seen that the debt and equity ratios are important elements in fixing the rate of return.

The majority of the Commission adopted the debt and equity ratios accepted by its staff and fixed the rate of return at 6.38%, which the staff found to be the actual earning experience of the Bell System in 1956. Commissioner Catterall thought the proper basis for calculating the rate of return should be a capital structure of 42% debt and 58% equity, which he used in calculating the required rate of return to be 5.83%.

Dr. Howell recommended a debt ratio of 45%, but said that if the use of that figure be considered too much at variance with the Bell Company's "extremely conservative policy," then he recommended 42.5% debt, which he testified had been the approximate average debt of the Bell System since 1946.

Assistant Vice-President Johnson for the Company testified that the debt ratio of the Bell System had fluctuated through the years as its capital needs and its earnings varied; that in 1950 it was 41.1% and had not been over 40% since, and that the average debt ratio over the past 35 years had been 35%.

The appellants argue that the "overwhelming weight of authority is that a debt ratio of 45% debt, 55% equity, is fair and reasonable to the public utility and to the consumer and financially sound and appropriate."

It is unquestionably true that many of the State commissions have held that a debt ratio of 35% was too low to use as a basis for establishing the rate of return allowed to telephone companies.[2]

[2] *Southern Bell Tel. & Tel.* v. *Louisiana,* (1957), 18 P.U.R. 3d 329, 336; *Re Southern Bell Tel. & Tel. Co.,* (Miss. 1956), 16 P.U.R. 3d 415, 441; *Re Southern Bell Tel. & Tel. Co.,* (Tenn. 1956), 12 P.U.R. 3d 170, 190; *Re Mountain States Tel. & Tel. Co.,* (Idaho 1955), 8 P.U.R. 3d 265, 274; *State Corp. Com.* v. *Mountain States T. &*

The appellate courts of Louisiana, Massachusetts and Vermont have declined to interfere with such findings of their State commissions.[3]

Other commissions, however, have refused to substitute a hypothetical capital structure for the one established by company management in the absence of evidence which admits of little argument that such should be done.[4]

In the *Norfolk* case we said that "as a practical matter the debt ratio must be reasonable and safe and the rate of return on the base such as to pay interest on the debt and afford reasonable assurance to investors that the utility under prudent management will be able to meet the economic obligation to pay reasonable dividends. Otherwise, its equity capital (stock) will not be attractive to investors and thus not readily salable."

Courts and commissions should of course take a long look at the record before deciding that a public utility should owe more money than it does. That question is primarily for the judgment and integrity of its management. It is only when it is made clear by the evidence that the officers and directors are following a policy in this regard which unreasonably favors the stockholders at the expense of the consumers that the rate-making tribunal should substitute a capital structure radically different from one fashioned by the officers and directors of the corporation. The evidence in this case does not

---

T. Co., (N. M. 1954), 4 P.U.R. 3d 33, 47; *Re Southern Bell Tel. & Tel. Co.,* (Ala. 1954), 4 P.U.R. 3d 195, 232; *Re C. & P. Tel. Co.,* (D. C. 1954), 6 P.U.R. 3d 222, 239; *Re Pacific Tel. & Tel. Co.,* (Wash. 1953), 100 P.U.R. (N.S.) 309, 327; *New England T. & T. Co. v. State,* (N. H. 1953), 99 P.U.R. (N.S.) 111, 119; *Re C. & P. Tel. Co.,* (Md. 1952), 93 P.U.R. (N.S.) 215, 238.

Generally these commissions take the view that while they do not possess the power to require the utilities to maintain specific ratios of debt and equity, yet they have the duty to protect rate payers from excessive charges resulting from overbalanced capital structures. This view meets the approval of Professor Rose as expressed in his article " 'Cost of Capital' in Public Utility Rate Regulation," 43 Va. Law Rev. 1079; but the disapproval of Professors Joslin and Miller in their article entitled "Public Utility Rate Regulation: A Re-examination" in the same publication, 43 Va. Law Rev. 1027. See generally Nichols on Ruling Principles of Utility Regulation, p. 267.

[3] *Southern Bell Tel. & Tel. Co. v. Louisiana Public Service Com.,* 232 La. 446, 94 So. 2d 431; *New England Tel. & Tel. Co. v. Dept. of Public Utilities,* 331 Mass. 604, 121 N. E. 2d 896, 6 P.U.R. 3d 65; *Petitions of New England Tel. & Tel. Co.,* 116 Vt. 480, 80 A. 2d 671.

[4] *Re Pacific Tel. & Tel. Co.,* (Calif. 1958), 23 P.U.R. 3d 209, 223-4; *Re Diamond State Tel. Co.,* (Del. 1958), 21 P.U.R. 3d 417, 436; *Re Northwestern Bell Tel. Co.,* (Minn. 1958), 23 P.U.R. 3d 267, 273; *Re New York Tel. Co.,* (1957), 20 P.U.R. 3d 129; *Re Rochester Tel. Corp.,* (N. Y. 1958), 24 P.U.R. 3d 262.

warrant our overturning the Commission's action and substituting a different judgment.

The third and final assignment is that the Commission's action resulted from an unreasonable exercise of its authority and was arbitrary and capricious. This assignment involves the rulings of the Commission already discussed. In substance the argument is that the Commission should have accepted the testimony and the conclusions of the appellants' witnesses or of the Commission's staff, or have reached a determination somewhere between those views and the conclusions of the Company's witnesses, whereas it accepted the testimony and conclusions of the Company's witnesses on the disputed points. Such choice, however, was the prerogative of the Commission committed to it by the Constitution and laws of the Commonwealth, and under settled principles its conclusions may not be overthrown in the absence of a clear abuse of legislative discretion, which the evidence in this case does not establish.

The order of the Commission is

*Affirmed.*