## Richmond

COMMONWEALTH OF VIRGINIA V. VIRGINIA ELECTRIC AND POWER COMPANY.

VIRGINIA CITIZENS CONSUMER COUNCIL, INC. V. VIRGINIA ELECTRIC AND POWER COMPANY.

AD HOC COMMITTEE ON VEPCO RATES V. VIRGINIA ELECTRIC AND POWER COMPANY.

BUILDING OWNERS AND MANAGERS ASSOCIATION OF METROPOLITAN WASHINGTON, ET AL. V. VIRGINIA ELECTRIC AND POWER COMPANY.

April 26, 1971.

Record Nos. 7514, 7515, 7590 and 7591.

Present, Snead, C.J., I'Anson, Carrico, Gordon, Cochran and Harman, JJ.

*Andrew P. Miller, Attorney General; Henry M. Massie, Assistant Attorney General,* for appellant in Record No. 7514.

*William R. Durland (Stanley E. Sacks; Reiber & Durland* [D.C.]; *Sacks, Sacks and Tavss,* on brief), for appellant in Record No. 7515.

*Peter Parker* [Md.] *(Harry T. Marshall,* on brief), for appellant in Record No. 7590.

*David J. Mays; John F. Kay, Jr.; John W. Edmonds, III; Charles J. Pilzer* [D. C.]; *Mays, Valentine, Davenport & Moore,* on brief for appellant in Record No. 7591.

*George D. Gibson (John W. Riely; Evans B. Brasfield; Guy T. Tripp, III; Hunton, Williams, Gay, Powell & Gibson,* on brief), for appellee in Record Nos. 7514, 7515, 7590 and 7591.

GORDON, J., delivered the opinion of the court.

In November 1969, Virginia Electric and Power Company filed

an application with the State Corporation Commission for permission to increase its electric rates so as to produce $25,000,000 additional gross revenue. After hearing the evidence presented by the Company, the staff of the Commission and the intervenors, the Commission by order entered June 10, 1970 authorized rate increases to produce about $22,482,000 additional gross revenue and directed the Company to file revised schedules of rates consistent with that order. These appeals ensued.

Under the generally accepted method of determining rates, the Commission first ascertains the utility's jurisdictional rate base and its comparable net operating income. ("Jurisdictional rate base" refers to the total investment in facilities that are used and useful in providing service to customers whose rates are being regulated by the Commission.[1] "Comparable net operating income" refers to net operating income attributable to customers whose rates are being regulated by the Commission.) The Commission then fixes a rate of return on the jurisdictional rate base that will afford the utility reasonable opportunity to earn a fair and just return on its investment.[2] So both the Company and the staff of the Commission presented evidence relating to the Company's jurisdictional rate base at the end of the "test year" (1969) and the Company's comparable net operating income for the test year.

According to the Company's evidence, its jurisdictional rate base at the end of the test year was $1,102,400,000[3] and its comparable net operating income for the test year was $75,529,000. The staff's evidence showed a jurisdictional rate base of $1,064,871,000 and comparable net operating income of $86,100,000. So the Company's figures reflected a 6.85% return on jurisdictional rate base, while the staff's figures reflected an 8.09% return.

The Company's capitalization at the end of the test year totaled

[1] The Company operates an integrated electric system in Virginia, North Carolina and West Virginia. The State Corporation Commission of Virginia does not regulate rates to customers in North Carolina or West Virginia or rates regulated by the Federal Power Commission. Also, a Virginia statute exempts from regulation by the State Corporation Commission rates charged to "any municipal corporation or to the State or federal government". Va. Code Ann. § 56-234 (Supp. 1970).

[2] Board of Supervisors v. Virginia Electric and Power Co., 196 Va. 1102, 1111, 87 S.E.2d 139, 145 (1955), quoting from City of Norfolk v. Chesapeake and Potomac Tel. Co., 192 Va. 292, 301, 64 S.E.2d 772, 777-78 (1951).

[3] Except as otherwise indicated, dollar amounts are rounded to the nearest $1,000.

$1,419,013,000.[4] According to the evidence, increasing customer demand for electricity requires the Company to invest $1.9 billion in electric facilities during the years 1970-1975. Of that total, the Company proposes to raise $1.4 billion by the issue and sale of approximately $910 million of debt securities and $490 million of equity securities.[5]

The Company's first expert witness based his opinion as to a fair rate of return on projections to December 31, 1972. In his opinion, "rates are for the future, not for the past. Past costs can be used where appropriate, but unless adjusted for known changes in the near future, the resulting rates are out of date as soon as they are written down. The embedded cost, in other words, shows what a company has paid for capital in the past, but fails to indicate what future costs might be as the company seeks to finance its construction program".

This expert was of opinion that the embedded cost of the Company's senior capital would increase from 5.14% at the end of the test year to 6.30% at December 31, 1972, midway through the Company's planned expansion program. In this expert's opinion, a fair rate of return on the Company's common equity was in the range 12.5-13.5%. He concluded that a fair rate of return on the Company's capitalization was in the range 8.32-8.66%.

A second expert witness for the Company expressed this opinion: "Virginia Electric Power, during the years 1970-1972 on the average, needs a rate of return of 8.45% on capitalization, and 12.9% on common equity. Converting these precision findings into reasonable bands, I find need for a rate of return on capitalization within a band of 8.30-8.60 percent, and on common equity within a band of 12.4-13.3 percent." He also expressed the opinion that the needed rate of return on the Company's total electric rate base at the end of the test year was 8.75%.

Another expert witness for the Company expressed concern about

---

[4] 
| Mortgage bonds | $701,200,000 |
|---|---|
| Debentures | 60,800,000 |
| Short term debt | 53,900,000 |
| Preferred stock | 126,447,000 |
| Common stock | 344,874,000 |
| Earnings reinvested in business | 131,792,000 |
| | $1,419,013,000 |

[5] The evidence shows that the Company raised about $156 million from the sale of common stock and bonds in March and April 1970.

the Company's interest coverage (the ratio of the Company's net earnings to interest expense), which had fallen from 4.75 in 1967 to 2.56 in 1970. He predicted the coverage would fall to 2.16 in 1974, assuming approval of the Company's requested $25,000,000 rate increase and interest on new debt in 1970 at 8-½% and on new debt in 1971-1974 at 7%.[6]

In this expert's opinion, the Company's rate of return on capitalization should be sufficient to provide an adequate interest coverage and an adequate return on equity capital. He fixed the minimum acceptable interest coverage at 3.0 and the minimum acceptable return on common equity at 13.5%. Based on the assumption that the Company's requested $25 million rate increase would be granted and on an estimate of the cost of new senior capital to be raised in 1970 and 1971, this expert projected returns on equity capital of 13.6% in 1970 and 12.4% in 1971.

The expert witness for the Commission staff based his computation of the cost of the Company's capital on 5.14%, representing embedded cost of senior capital at the end of the test year, and 11.00-12.25%, representing in his opinion the range of "embedded cost" of common equity at that date. Using the appropriate factors, he concluded that the Company's cost of capital at the end of the test year was in the range 6.89-7.29%.

This expert rejected the method employed by the Company's experts, saying: "I cannot agree that calculating the cost of capital three years hence is a proper method of determining a fair rate of return at the present time and during the interim until the hypothetical 'cost of capital' as of December 1972 is reached. . . . [T]o give, at the present time, a rate of return which will be fair three years hence is anticipating the regulatory lag by too great a margin".

This expert admitted, however, that his range 6.89-7.29%, representing the cost of capital at the end of the test year, indicated only the minimum return the Company should receive on its rate base. "[A]ll segments of the rate base must earn at least the cost of capital."

An expert witness for the intervenor Ad Hoc Committee on Vepco Rates based his opinion on the Company's capitalization at May 1, 1970. At that time, the Company's total capitalization had been in-

---

[6] An indenture precludes the Company from issuing additional bonds if the Company's annual net earnings are less than twice the annual interest charges on the outstanding bonds (including the additional bonds) and on any other indebtedness secured by a senior lien. This ratio fell from 5.07 in 1967 to 2.80 in 1970.

creased to $1,521,719,000.[7] This witness was of opinion that the "annual cost of senior capital" was 5.30% and a fair rate of return on common equity was 10.30%. He concluded that a fair rate of return on capitalization was in the range 6.90-7.00%.[8]

At public hearings during the period May 4-May 26, 1970, the Commission heard over 2,000 pages of testimony and received many exhibits respecting the proposed aggregate rate increase and the rate design to be effected by revised rate schedules applicable to the various classes of customers. On June 10, 1970, the Commission entered the order now appealed from, authorizing an aggregate rate increase of about $22,482,000 and laying down guidelines for the revised rate schedules to be filed by the Company.

On the same day, Commissioner Catterall handed down an opinion. Rejecting the generally accepted method of determining rates and consequently ignoring most of the evidence, Commissioner Catterall based his decision on an estimate of the amount the Company must earn to attract capital. His basic determination was: "As near as I can judge from the voluminous evidence in this case, the company cannot attract the equity capital it must attract unless it is given a chance to earn about 12-½% of its net worth or $68,534,000." Stated another way, Commissioner Catterall concluded that 12.5% was the proper rate of return on the Company's common equity of $548,272,-000 (see n. 7 *supra*).

From the premise that the Company's return on common equity should be $68,534,000, Commissioner Catterall concluded that the Company should be granted a rate increase of $22,482,000, as shown by the following summary from his opinion:

---

[7] The Company's prospectus dated April 21, 1970, which was introduced in evidence, shows the Company's capitalization at December 31, 1969 adjusted, pro forma, to reflect the issue and sale of 3,000,000 shares of common stock and $85,000,000 of bonds in March and April 1970 (see n. 5 *supra*) and the retirement of short-term indebtedness:

| | |
|---|---:|
| Mortgage bonds | $ 786,200,000 |
| Debentures | 60,800,000 |
| Preferred stock | 126,447,000 |
| Common stock | 416,574,000 |
| Earnings reinvested in business | 131,698,000 |
| | $1,521,719,000 |

[8] This witness admitted that his figure 5.30%, representing the annual cost of senior capital, was "on the bare bones side" or "skimpy". On cross-examination, he apparently admitted an error in his calculation and that it would probably be correct to increase his estimate of the fair rate of return on common equity from 10.30% to 11.02%.

### "Expected Annual Revenue Requirements

Amount needed to pay interest on bonds and dividends on preferred stock[9] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ 51,617,000

Amount needed to pay dividends on common stock[10]   68,534,000

Total amount needed to pay interest and dividends[11] . . $120,151,000

### "Expected Annual Net Earnings

Earnings from sale of electricity in 1969 in Va., W. Va. and N. C. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $102,000,000

Earnings from sale of electricity to new customers during the coming year[12] . . . . . . . . . . . . . . . . . . . . . . . . .   5,760,000

Additional earnings from W. Va. and N. C. if Vepco continues to charge in those states the same rates as in this State[13] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1,200,000

Earnings from sale of gas[14] . . . . . . . . . . . . . . . . . . . . . .   2,800,000

$111,760,000

Less increased expenses . . . . . . . . . . . . . . . . . . . . . . . . .   2,850,000

Available to pay interest and dividends . . . . . . . . . . . . $108,910,000

### "Additional Earnings Required from Sale of Electricity in Virginia

Amount required . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $120,151,000

Amount available . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108,910,000

Increase after taxes required . . . . . . . . . . . . . . . . . . . . . $ 11,241,000

Increase before taxes required . . . . . . . . . . . . . . . . . . . . $ 22,482,000"

Commissioners Hooker and Dillon concurred only in the result of Commissioner Catterall's opinion. On June 22, 1970 Commissioner

---

[9] This includes interest on bonds issued in April 1970 (see n. 7 *supra*).

[10] This apparently refers to earnings, rather than dividends, on common stock.

[11] See n. 10 *supra*.

[12] This assumes that the Company will realize additional earnings equal to 8% of the gross proceeds of the sale of the Company's common stock in March 1970 (see n. 7 *supra*). The Company challenges the assumption that moneys raised for investment in facilities produce immediate revenues.

[13] This apparently assumes that comparable rate increases will be granted in West Virginia and North Carolina.

[14] 1969 earnings.

Hooker handed down a majority opinion concurred in by Commissioner Dillon. The majority opinion used the rate base method described in the second paragraph of this opinion (the "rate base/rate of return" method), which is the generally accepted method of determining rates and has been approved by this Court many times. *E.g., Board of Supervisors* v. *Virginia Electric and Power Co.*, 196 Va. 1102, 87 S.E.2d 139 (1955) (the Company's last previous rate case).

The majority opinion pointed out that the expert witnesses substantially agreed upon the Company's total rate base, but disagreed as to the jurisdictional rate base. For the complex task of determining the jurisdictional rate base, the Company's expert used the "peak responsibility" method and the staff's expert the "average and excess" method. The majority was "not convinced that either cost allocation method is superior to the other". So after making correcting adjustments to each expert's figures, the majority fixed the jurisdictional rate base at the mean between the two adjusted figures: $1,085,028,852.

The majority also adjusted the Company's comparable net operating income for the test year by (i) eliminating any deduction for the federal surtax, which expired six months after the end of the test year, (ii) amortizing the federal investment tax credit over a period of 10 years, (iii) reducing certain expense items regarded as non-recurring, and (iv) eliminating certain charitable deductions. In the Company's favor, the majority allowed deductions for wage increases and environmental protection expenditures to be incurred after the test year, but committed for during the test year. After making these adjustments, the majority fixed the Company's comparable net operating income for the test year at $79,741,938.

The opinion reviewed the evidence as to a fair rate of return, pointing out that the expert witnesses expressed their opinions in relation to total capitalization instead of rate base. But "[t]he total capitalization of the Company", the opinion noted, "is not significantly different from the total rate base". Pointing out that "[a] fair rate of return can never be established by rule of thumb", the opinion concluded that "[i]n the light of all the evidence . . . the proper rate of return for this Company on the rate base determined in this opinion is within the range of 8.0 to 8.5 percent".

The majority opinion then set forth the following results for the test year, using the jurisdictional rate base and the operating revenue

and expenses previously fixed in the opinion and the $22,482,000 rate increase authorized by the Commission's order of June 10, 1970:

|  | "Before Increase | After Increase |
|---|---|---|
| Rate Base | $1,085,028,852 | $1,085,028,852 |
| Gross Revenues | 245,670,182 | 268,152,182 |
| Expenses | 165,928,244 | 177,176,240 |
| Net Income | 79,741,938 | 90,975,942 |
| Rate of Return | 7.35% | 8.38%" |

## I

### The Method of Rate Determination

We agree with appellants' contention that Commissioner Catterall's method of determining rates is not sound. He inquired into a proper return only on the common equity of the Company as a whole, and he made his conclusion in terms of the annual revenue needed by the Company as a whole.

Rates fixed by the Commission should be just and reasonable to the consumers whose rates are fixed, as well as to the Company. To determine only the fair return from all customers, jurisdictional and nonjurisdictional, does not carry out the Commission's function of determining a fair return from jurisdictional customers. The Commission should fix just and reasonable rates to be charged jurisdictional customers in relation to the Company's cost of serving them.

If rates for jurisdictional customers are fixed upon estimates of total revenues from jurisdictional and nonjurisdictional customers, without regard to jurisdictional rate base, jurisdictional customers may be charged rates disproportionate to the Company's cost of serving them. The Commission carries out its function by looking to just and reasonable rates for jurisdictional customers in relation to the cost of serving them, leaving it to the Company to secure a fair return from nonjurisdictional customers.

Nevertheless, we disagree with appellants' further contention that disapproval of Commissioner Catterall's method means disapproval of the conclusion reached by the majority of the Commission. Appellants contend that the majority did not make an independent finding that a rate increase of $22,482,000 was just and reasonable. Rather, they contend, the majority accepted the determination improperly

arrived at by Commissioner Catterall and applied the rate base/rate of return method only to justify that determination.

We cannot accept appellants' characterization of the majority opinion. Instead, we must accept the majority opinion according to its tenor as an independent determination by Commissioners Hooker and Dillon, applying the rate base/rate of return method, that a rate increase of $22,482,000 was just and reasonable. We have approved that method, which relates rates to the cost of service. If, therefore, the rates so determined are within the zone of the Commission's discretion as a legislative body and are not based on error of law, we must affirm. *City of Norfolk* v. *Chesapeake and Potomac Tel. Co.*, 192 Va. 292, 64 S.E.2d 772 (1951).

## II

### Rate Base, Rate of Return and Comparable Net Operating Income

### A. Rate Base

■ Appellants assign two errors to the manner in which the jurisdictional rate base was determined in the majority opinion. They assert that the Commissioners should have rejected the "peak responsibility" method used by the Company's expert witness and approved the "average and excess" method used by the staff's expert witness.[15]

---

[15] The complexity of allocating costs to determine jurisdictional rate base, which in the Company's case must be done horizontally and vertically (see n. 1 *supra*), can be demonstrated by brief references to the testimony of the Company's and the staff's expert witnesses.

The method used by the Company's expert witness, which the Commissioners called the "peak responsibility" method, apparently involves two allocation methods, the "peak responsibility" or "coincident peak" and the "sum of non-coincident peaks". The Company expert described the methods as follows:

"This method [the 'peak responsibility' or 'coincident peak'] assumes that demand related costs are determined by the peak load which must be carried. This peak load is the maximum one hour demand and is the sum of the individual class loads occurring at the same hour. For allocation purposes, each class shares in proportion to its load at the time of the kilowatt peak of the system. Seasonal stability in the timing of area peak is essential for consistency of results under this method. The Peak Responsibility Method is particularly appropriate for the allocation of costs which vary in accordance with peak area loads.

" * * *

"This method [the 'sum of non-coincident peaks'] assumes that demand costs should be shared on the basis of the sum of the demands of individual customers irrespective of when they occur. . . ."

The staff's expert witness described the "average and excess" method as follows:

"Under this method that part of the fixed costs incurred to serve the average

In any event, they assert, the Commissioners should not have fixed the jurisdictional rate base by averaging the adjusted figures of the two experts.

The Company's expert and the staff's expert each explained why he thought his method preferable to the method used by the other, and each brought in another expert witness to support his opinion. It was the province of the Commissioners to determine which method should be used. *See Princess Anne Utilities Corp. v. Commonwealth,* 211 Va. 620, 625, 179 S.E. 2d 714, 717 (1971). Had they accepted the method used by the Company's expert, which was within their province, the result would have been higher rates than those the Commission authorized in this proceeding. Appellants therefore cannot complain of the rates fixed by averaging the results of the two methods.

█ Turning to the details of the calculations of the jurisdictional rate base, appellants contend for the first time on appeal that the adjusted figures of the Company's expert witness are erroneous with respect to street lighting. The original figures submitted by this expert improperly included certain costs of street lighting not subject to regulation by the Commission, but another witness introduced an exhibit adjusting the street lighting figure. The amount of the adjustment was not contested by any party, and the Commission found as a fact that it was correct. We will not disturb that finding.

## B. Rate of Return

█ Appellants contend that the Company did not bear its burden of showing a proper rate of return because it brought forth no evidence, and the other parties supplied no evidence, about a proper rate of return on the Company's jurisdictional rate base. Witnesses expressed opinions as to a proper rate of return only on the Company's total capitalization, except for one witness who expressed an opinion as to a proper rate of return on the Company's total electric rate base.

The staff's expert witness was of opinion that "the cost of money [cost of capital] can only be determined for the Company as a whole." The determination of a fair rate of return, in his opinion,

loads are allocated on the basis of kilowatt-hours, while the remainder of the system demand, that is the demand in excess of the average, is allocated among customer classes on the basis of their respective excess demands; that is, maximum non-coincident demand minus average demand. This method is generally recognized as being more in harmony with sound costing principles than the peak responsibility method and other methods such as the non-coincident demand method."

must be made on "a total company basis". The Ad Hoc Committee's expert witness said: "I apply it [the proper overall rate of return] to either a property base, original cost less depreciation plus working capital or to an invested capital base. I assume under regulated utility accounting there is a close approximation between these."

We agree that where, as is true of the Company, total capitalization and total rate base are not significantly different,[16] opinions as to a fair rate of return on capitalization can be properly translated into a fair rate of return on total rate base. *See J. Bonbright, Principles of Utility Rates* 242, n. 4 (1961).[17]

Moreover, a proper rate of return on total rate base may be properly applied to jurisdictional rate base. No reason has been advanced why the proper rate of return should differ for segments of an integrated electric system.

Appellants also contend that no justification has been shown for the rate of return fixed in the majority opinion, 8.38% on total capitalization.

As pointed out in *A. Kahn, The Economics of Regulation* 42 (1970), "there is no single, scientifically correct rate of return, but a 'zone of reasonableness,' within which [the Commission's] judgment must be exercised". Virginia cases recognize that principle. *City of Lynchburg* v. *Chesapeake and Potomac Tel. Co.*, 200 Va. 706, 712, 107 S.E.2d 462, 467 (1959); *Board of Supervisors* v. *Virginia Electric and Power Co.*, 196 Va. 1102, 1109, 87 S.E.2d 139, 144, 150 (1955).

The rate of return should be sufficient to enable the Company to attract the necessary capital to carry out its obligation to render service to the public. *FPC* v. *Hope Natural Gas Co.*, 320 U.S. 591 (1944); *Bluefield Co.* v. *Public Serv. Comm.*, 262 U.S. 679, 693 (1923); *Petersburg Gas Co* v. *City of Petersburg*, 132 Va. 82, 90, 110 S.E. 533 (1922); *see 1 A. J. Priest, Principles of Public Utility Regulation* 190-93 (1969). "There is a prospective element in the term 'attract capital' which may be lacking in the designation of 'cost of

---

[16] The evidence justifies the Commissioners' finding that "the total capitalization of the Company is not significantly different from the total rate base". At the end of the test year the Company's total capitalization was $1,419,013,000, compared with a total electric rate base of $1,444,491,000 according to the Company's figures or $1,444,190,320 according to the staff's figures.

[17] Professor Bonbright contrasts the relevance of (i) a proper rate of return on capitalization to (ii) a proper rate of return on rate base in the cases of (a) a utility like the Company and (b) a utility, unlike the Company, that has a heavy investment in non-utility assets or in different utility assets (*e.g.,* electricity, gas and steam heating). *J. Bonbright, Principles of Utility Rates* 242, n. 4 (1961).

capital.' " *E. Nichols and F. Welch, Ruling Principles of Utility Regulation* 73 (Supp. A, 1964).

Accordingly, expert witnesses in this case not only considered the test year, but also directed their inquiries to and based their opinions on the Company's need to attract capital in the future. No one questioned this need or the Company's estimate that it must raise $1.4 billion of capital during the years 1970-1975. Particularly in this case, therefore, the experts were justified in looking ahead when considering and expressing their opinions on a proper rate of return. In fact, the Ad Hoc Committee on Vepco Rates conceded this point in its brief.

The expert evidence supported the Commissioners' finding that a proper rate of return was in the range 8.0-8.5%. A rate of 8.38% being within the zone of reasonableness, we can only regard it legally just and reasonable.

■ Appellants point out that an 8.38% return on total capitalization applied to the Company's capital structure at the end of the test year results in a 15.59% return on the Company's common equity. Asserting that no expert justified a 15.59% return, they contend that the rate fixed by the Commissioners is not supported by the evidence and is excessive.

Appellants overlook, however, the fact that expert witnesses expressed their opinions not only in relation to the test year, but also in relation to the immediately succeeding years. Expert witnesses for the Company approved returns on common equity in the ranges 12.5-13.5% and 12.4-13.3% in terms of projected capitalization at December 31, 1972 or in terms of an average rate of return on common equity through December 31, 1972. An expert witness for the Company, who fixed the minimum interest coverage at 3.0 and the minimum rate of return on common equity at 13.5%, testified that the rate of return on common equity for the present and several years in the future should be in the range 13.5-14.5%. Applying an 8.38% rate to projected increased capitalization after the test year reduces appellants' figure of 15.59% to well within the range of these experts' testimony.[18]

---

[18] According to the Attorney General's brief, the rate on common equity would drop from 15.59% to 14.5% at five months after the end of the test year. Accepting the expert witnesses' projected capitalization, we find that the rate would drop to 12.7% at December 31, 1972.

## C.  Comparable Net Operating Income

The first witness for the Company offered exhibits showing expense deductions for wage increases and environmental protection expenditures to be incurred after the test year, but the Commission rejected them, ruling that it would not consider expenses beyond the test year. Later, during the cross-examination of a Company witness, the Commission modified its ruling by announcing that evidence of "an established fact and not a surmise or guess, relating to subsequent years" would be admitted for the Commission's consideration. During the presentation of the staff's evidence and after the Company had objected to certain out-of-test-year evidence proffered by the staff, the Commission changed its ruling: "This being a purely legislative proceeding, we will permit the record to contain all material offered. . . . The bailiff will cross out the notation 'Refused' that he has written on some of the exhibits."

In computing the Company's comparable net operating income, the majority opinion excluded any deduction for the federal surtax, which was effective during the test year but eliminated in the next year. The opinion also allowed deductions for wage increases and environmental protection expenditures to be incurred after the test year, but committed for during the test year.

Appellants contend that the Commission erred in allowing the wage increase and environmental protection expenses. We reject that contention. Although the use of a test year is proper, the Commission, in exercising its legislative function of fixing utility rates for the future, should not be blind to the future. It may adjust the results of the test year by allowing for known changes to make the test year representative of the future. The Commission has followed this practice in the past. *City of Lynchburg* v. *Chesapeake and Potomac Tel. Co.*, 200 Va. 706, 708, 107 S.E.2d 462, 464 (1959).

The staff proposed elimination of expenses incurred during the test year for promotional allowances and trade ally advertising, on the ground that by order entered in April 1970 the Commission had disapproved further use of such allowances and advertising in the form engaged in by the Company. The Commission refused to eliminate those expenses, finding it reasonable to assume that the Company would substitute some other form of sales promotion activity at an equal or greater cost. We see no reason to disturb that finding and reject appellants' complaint in that regard.

On appeal, the appellants complain for the first time that after

admitting evidence of future wage increases, the Commission should have admitted and considered projections of increased Company revenues under existing rates. To answer that contention, we need only point out that no such evidence was proffered to the Commission.

## III

### Rate Design

■ With its application for a $25 million rate increase, the Company filed revised schedules of rates to customers. The Commission's public notice of the hearing set for May 4, 1970 referred to the proposed new schedules and invited interested persons to intervene and be heard.

During the public hearing, the Commission heard evidence not only about total rates but also about the proposed rate schedules. The Commission's order of June 10, 1970 determined the controverted issues about the schedules, and the majority opinion gave reasons for those determinations. The Company then filed schedules carrying out the Commission's decision. We need discuss only two contentions made by the appellants in this regard.

The Attorney General contends, and the other appellants echo the contention, that due process of law was violated by the Commission's failure to hold another public hearing directed to the schedules filed pursuant to the June 10, 1970 order. Neither the Attorney General nor any other appellant cites authority to support that proposition. We hold that due process was satisfied by the public hearing held before entry of the June 10, 1970 order.

The Company's application asked that all new rates be made applicable to a 30-day period, so that if a meter reading were for a period other than 30 days, the billing would be prorated on a 30-day basis. The Commission's Chief Engineer for Electric Utilities was of opinion, however, that it would be "difficult for the small user to understand why his bills would vary from month to month for the same amount of electricity used". He said: "We receive letters from customers now saying that the utilities charge whatever they want. I'm certain that, after being billed on schedules such as these, many people will be convinced that there is no control over the rates of utilities".

The Chief Engineer recommended that since as a rule only the large general service customers have personnel capable of under-

standing 30-day billing, the 30-day rate be made applicable only to them.  The Commission agreed and directed that the 30-day rate be made applicable only to Schedule 6 (large general service) customers.

The Building Owners and Managers Association contends that applying the 30-day rate only to Schedule 6 customers denies them equal protection of the laws.  But since the classification is reasonable, equal protection is not violated.

*Affirmed.*