# Richmond

## Apartment House Council of Metropolitan Washington, Inc. v. Potomac Electric Power Company.

October 14, 1974.

Record No. 740387.

Present, I'Anson, C.J., Carrico, Harrison, Cochran, Harman and Poff, JJ.

*Charles Jay Pilzer [D. C.] (Ronald D. Jacobs; Jacobs, Pilzer & Speiller [D. C.], on brief), for appellant.*

*Edward A. Caine [D. C.] (Guy T. Tripp, III; Carl D. Hobelman [N. Y.]; Hunton, Williams, Gay & Gibson; LeBoeuf, Lamb, Leiby & MacRae [N. Y.], on brief), for appellee.*

*Richard D. Rogers, Jr.,* for State Corporation Commission, *amicus curiae.*

Cochran, J., delivered the opinion of the court.

On April 30, 1973, Potomac Electric Power Company (Pepco) filed its application with the State Corporation Commission (Commission) for an increase in electric rates to produce additional annual gross revenues of $1,055,000. The Commission, after hearing evidence introduced by Pepco, the Commission staff, and intervenors, including Apartment House Council of Metropolitan Washington, Inc. (AHC), entered an order on January 4, 1974, authorizing rate increases to produce additional annual gross revenues of $686,650 to give Pepco an 8.5% rate of

return on its jurisdictional rate base [1] computed at the end of the twelve month "test period." The Commission directed Pepco to file revised rate schedules consistent with the order. AHC appealed.

The sole error assigned by AHC is that the Commission approved a rate design structure that will result in a substantially higher rate of return to Pepco for two classes of service, general service and high tension service, than for residential service and that such rate differential is discriminatory and unsupported by the evidence. AHC is a general service customer.

Pepco provides electric service in the District of Columbia, nearby areas in Maryland, and a small part (12%) of Arlington County, Virginia. Pepco's Virginia operation includes service to large federal installations, such as the Pentagon and Fort Myer, and to approximately 2,500 residential customers. Less than 2% of Pepco's kilowatt-hour sales in Virginia are to residential customers, and these sales amount to only about 1/10th of 1% of Pepco's total sales.

Pepco has three major classes of customers. High tension customers generally use larger amounts of electricity, take delivery of the service at a high voltage, and transform it with their own equipment. General service customers are primarily commercial users of varying sizes. Residential customers are small users, for whom Pepco must provide transformers, poles, lines, and other equipment to reduce the power to a lower voltage and deliver it.

In its Memorandum Opinion and Order of January 4, 1974, the Commission found that Pepco had proposed an overall increase in its rates of 14.5%, including increases of 10% for residential service, 13.5% for general service, and 16.2% for high tension service. The Commission noted that it had reviewed the schedules of rates, charges, rules, and regulations of Pepco on two previous occasions within the preceding three years. In approving a greater increase in rates to general service and high

---

[1] As used herein "jurisdictional rate base" refers to Pepco's capital investment in facilities providing service to customers whose rates are subject to regulation by the Commission.

tension customers than to residential customers the Commission made this finding:

"Pepco has one of the most unfavorable load factors [2] in the electric utility industry. The evidence indicates that growth in loads, and pattern of loads, to high tension and general service customers has had a more adverse effect on overall system load than residential growth, and that these same services have caused a greater need for investment in plant.

"The Commission finds the relationship among the customers and classes of customers reasonable as regards the proposed distribution of revenue requirements. Accordingly, the Company should, to the extent practicable, make uniform percentage reductions from the originally proposed rates in order to redesign rates to produce additional annual revenues of $686,650."

Under the provisions of Article IX, Section 2 of the 1971 Constitution of Virginia, the Commission is assigned the responsibility of fixing electric utility rates subject to the requirements prescribed by law. Pursuant thereto § 56-234 of the Code (Repl. Vol. 1974) provides in pertinent part:

"It shall be the duty of every public utility to furnish reasonably adequate service and facilities at reasonable and just rates to any person, firm or corporation along its lines desiring same, and to charge uniformly therefor all persons or corporations using such service under like conditions. The charge for such service shall be at the lowest rate applicable for such service in accordance with schedules filed with the Commission pursuant to § 56-236."

In fixing reasonable and just rates the Commission performs a legislative function. Its decision, therefore, will not be set aside unless the Commission has exceeded its reasonably wide area of legislative discretion. *Board of Supervisors* v. *VEPCO*, 196 Va. 1102, 1109, 87 S.E.2d 139, 144 (1955); *see also Commonwealth* v. *VEPCO*, 211 Va. 758, 767, 180 S.E.2d 675, 682 (1971). The findings of the Commission are presumed to be correct. *Farmers and*

---

[2] "Load factor" may be generally defined as a ratio of the actual number of kilowatt-hours generated during the test period to the kilowatt-hours that would have been generated if the company had produced electricity, throughout the year, at the level of its peak sales period.

*Merchants* v. *Commonwealth*, 213 Va. 401, 404, 192 S.E.2d 744, 747 (1972). Moreover, the determination of the sources from which increased revenues are to be derived is peculiarly a responsibility of the Commission. *See Norfolk* v. *Chesapeake, etc., Tel. Co.*, 192 Va. 292, 320, 64 S.E.2d 772, 789 (1951).

Applying the rate base/rate of return method that we have heretofore approved, *Commonwealth* v. *VEPCO, supra*, 211 Va. at 767, 180 S.E.2d at 682, the Commission found that an 8.5% rate of return on Pepco's end-of-period jurisdictional rate base was just and reasonable. AHC does not challenge that finding. The Commission made no finding of rate of return by classes of customers, and no such finding is required by our statutes or case law. AHC concedes that the Commission has been granted broad discretionary power to determine unit rates and rate of return on rate base and that mere variation in rate of return between classes of customers is not of itself discriminatory. Nevertheless, AHC maintains that in the present case there is no evidence to justify the variation and that the rate of return is therefore discriminatory.

AHC relies heavily on a class cost of service study, prepared by Pepco, which AHC introduced into evidence. This study purported to show that the rate of return by classes of Virginia customers varied substantially, the residential class having the lowest rate of return, followed in ascending order by the high tension and general service classes.

Frank S. Walters, Vice President in charge of Rate and Regulatory Practices and principal witness for Pepco, testified that the proposed new rate schedules and the class cost of service study had been prepared under his direction. He asserted that the proposed rate design had been prepared in accordance with Commission instructions. However, Walters further testified that he thought that the class cost of service study showed an unrealistically low rate of return for residential users, because of the small size of this class, the difficulty of identifying certain service connection facilities, and the fact that some of those facilities serve more than one customer in the class.

Walters explained that there were two reasons why Pepco did not attempt, through the proposed rate design, to equalize the rate of return by classes. First, "the production cost, particularly the cost of plant, is a very large proportion of the total cost of serving a high voltage customer," so that an increase in the cost

of production plant should be reflected in a greater percentage rate increase to this class of customer than to the residential user, who has a much smaller portion of his total cost of service embedded in production costs.

The second justification given by Walters for the differential was that nearly all the high tension customers are fully air-conditioned, whereas general service customers are air-conditioned to a lesser extent and residential customers even less. Despite a declining overall load factor, the increasing summer load [3] due to air conditioning has contributed to Pepco's undertaking a substantial construction program to meet the summer demand. As evidence as to which class contributed most heavily to the increased summer demand, AHC introduced into evidence a graph which indicated that, at its peak usage time, the residential class showed an increase of 153% over its low point of usage, while general service and high tension classes showed increases of only 55% and 56%, respectively. However, the graph also showed that the residential class's actual increase in megawatt-hours was negligible when compared to the actual increase in electricity used by the other two classes.[4] It is not the percentage figures, but the megawatt-hours figures that are significant in determining which class is the greatest factor in creating Pepco's summer peak.

Walters could not quantify the considerations that were analyzed in proposing the new rate schedules. He referred to six elements: price elasticity reflected in sales volume, value of service in comparison with competing fuels, return on rate base, cost of providing service other than return on rate base, billing statistics from which to change block rates, and the need to increase the summer-winter differential so as more nearly to allocate the costs of peak responsibility to the period during which those costs were incurred. Walters was unable, however, to describe specifically how each of the elements fit into the analysis or the extent, if any, to which each was actually used. He testified that he felt that it was not possible or practical to

---

[3] Pepco's summer peak is 60% greater than its winter peak.

[4]
| Class of Customer | Lowest Usage | Highest Usage |
|---|---|---|
| Residential | 415 MWH | 1,051 MWH |
| General | 11,899 MWH | 18,400 MWH |
| High Tension | 14,875 MWH | 23,268 MWH |

design rates on a specific cost relation basis but that the proposed rates were not made without consideration of cost.

John D. Hall, Jr., employed by the Commission as Utility Tariff Analyst, Division of Public Utilities, testified that Pepco's proposed rate structure was consistent with the rate design made pursuant to his earlier recommendations which had been approved by the Commission approximately a year previously.

In addition to the class cost of service study AHC relied on the testimony of its expert witness, Edgar H. Bernstein, a public utility and environmental consultant. Bernstein testified that the Pepco rates should have been, but were not, based on cost of service to each class of customer and were improperly weighted against low voltage commercial customers who, he said, contribute a larger share of net operating income than any other class. He found no justification for this disparity and concluded that the high voltage and residential customers should be charged the "larger parts of any rate increase."

Bernstein testified that, in his opinion, each class of customer should earn approximately the same rate of return, based on the cost of rendering service. He conceded that judgment plays a part "to a degree" in all cost allocation studies and that allocation factors may vary considerably if a different method of allocation is used. He denied, however, that there was any variation which justified, in his opinion, the greater rate of return for general service customers that would result from the proposed new rate design.

On oral argument, AHC also noted that the record reflected that the load factors of the general service and high tension classes were higher, and therefore more favorable to Pepco, than was the residential load factor. The Commission, however, may have found more persuasive Pepco's evidence that the increased cost for production and generating plant and equipment, necessary to meet the system's peak demands, was caused primarily by the air conditioning requirements of the high tension and general service customers.

The Commission, under its own rules, *see 1972 Annual Report of The State Corporation Commission*, pp. 239-40, had authority to call for a class cost of service study to be made by Pepco or by the Commission staff, but the Commission did not do so. Nor did

the Commission refer in its Memorandum Opinion and Order to the class cost of service study made by Pepco at AHC's request and introduced into evidence, or to any variation in rate of return from class to class. The plain inference is that the Commission did not regard this evidence, based in part upon a residential class of users producing in the past less than 2% of the jurisdictional sales, as significant.

The Commission was not required to accept the class cost of service study as either controlling or persuasive evidence in the case. Nor was the Commission bound by the opinions expressed in the testimony given by AHC's expert witness, which were controverted by Pepco's witness Walters. Where, as here, the evidence is conflicting, it is the duty of the Commission to weigh and interpret the evidence, *C. & P. Co. of Va.* v. *Com. of Va.*, 147 Va. 43, 51, 136 S.E. 575, 577 (1927), and, if the inferences therefrom are reasonable, it is our duty to affirm the Commission's order. *Southern Ry. Co.* v. *Commonwealth*, 193 Va. 291, 298, 68 S.E.2d 552, 557 (1952).

We find no abuse of discretion by the Commission and the order appealed from is accordingly

*Affirmed.*