ROANOKE GAS COMPANY

v.

DIVISION OF CONSUMER COUNSEL, OFFICE
OF THE ATTORNEY GENERAL, ET AL.

April 20, 1979.

Record No. 781395.

Present: I'Anson, C.J., Carrico, Harrison, Cochran, Poff, and Compton, JJ.

*Wilbur L. Hazlegrove (Hazlegrove, Dickinson & Rea, on brief), for appellant.*

*Richard D. Rogers, Jr.; Anthony Gambardella, Assistant Attorney General (Marshall Coleman, Attorney General; Lewis S. Minter; Edward L. Flippen, on briefs),for appellees.*

COCHRAN, J., delivered the opinion of the Court.

In this appeal of right from a final order of the State Corporation Commission approving an increase in rates, Roanoke Gas Company contends that the Commission erred in disallowing a weather normalization adjustment in test year figures to eliminate revenue attributable to the abnormally cold weather of the test year.

The Company distributes natural and manufactured gas to more than 29,000 residential, commercial, and industrial customers in and near the city of Roanoke. The customers may be classified in two general categories, namely, firm customers and interruptible customers. When available gas supplies are limited, interruptible customers may have their services temporarily discontinued. Accordingly, such customers pay a lower rate than do firm customers whose services are not subject to interruption. As of March 31, 1978, the Company had 68 interruptible customers. In periods of abnormally cold weather firm customers use more gas and less, therefore, is available for interruptible customers.

On April 26, 1978, the Company filed an application, accompanied by a schedule of revised tariffs designed to increase annual operating revenues by $1,148,865, later amended to $1,217,616. In its application, the Company stated that after almost seven years of declining gas supplies available for distribution, the Company's gas supply had stabilized and was expected to increase "modestly" beginning in 1979. In order to offset attrition and market an

increased supply of gas the Company sought to resume construction of additions to its plant and distribution system, but current rates were inadequate to attract capital for these purposes, and rate increases were required.

At a hearing on June 27, 1978, the Commission received the testimony of a witness for the Company and a witness from the Commission's Staff as to the appropriate rate of return. On July 12, 1978, a public hearing was conducted at which the testimony of three Company witnesses and two Staff witnesses, one an accountant and the other an engineer, was received.

The test year used in considering the Company's application was the year ended March 31, 1978. The rate base for the test year was reported by the Commission's Staff, after the adjustments, to be $15,282,879, and the Company accepted this figure.

In a statement of rate of return for the test year the Company showed accounting and pro-forma adjustments designed to reflect revenues which would have been received if the weather had not been unusually cold. The weather adjustment was based upon the Company's assumption that gas sales to firm customers during the months of June, July and August were not affected by the weather and that the average gas sold during these three months represented the basic monthly gas requirements of these customers. Working from this assumption, the Company determined that portion of the test year volume of gas sold to firm customers that was affected by cold weather. Then reducing the test year weather-sensitive volume by the ratio of normal year degree day deficiencies[1] for the area (a 30-year average of 4307, as published by the National Weather Service) to test year degree day deficiencies (4815), the Company projected the volume of gas that would have been sold to firm customers if there had been normal weather during the test year. The volume actually sold during the test year to firm customers in excess of the projected volume was treated as gas that would have been available under normal weather conditions for sale to interruptible customers. The interruptible rate was applied to this excess volume, resulting in a reduction in revenues derived from sales to firm customers and an

---

[1] A degree day is a measurement of cold weather based upon the extent to which daily mean temperature falls below 65 degrees Fahrenheit. For example, temperature that averages 64 degrees for a 24-hour period constitutes one degree day or one degree day deficiency.

increase in revenues derived from interruptible customers for a net deduction from test year revenues of $234,181.84, rounded to $234,182.

Staff accountants made various adjustments, based upon their field audit and review of the Company's records, but in their statement showing rate of return for the test year they included the same $234,182 weather normalization adjustment proposed by the Company with the explanatory notation that the test year weather was 12% colder than normal. The accounting adjustments were part of the pre-filed testimony of Paul D. Malone, a Staff public utility accountant. However, a Staff engineer, Ben J. Fink, in his pre-filed testimony, questioned the advisability of allowing the weather normalization adjustment. Although he agreed with the manner in which the adjustment was calculated, he pointed out, to illustrate the uncertainties in predicting weather, that the number of degree days for each of the preceding two years had substantially exceeded the 30-year average of degree days. He recommended an increase in the rates for interruptible customers in lieu of the proposed weather adjustment.

In their opening statements at the July 12 hearing, counsel for each Party referred to the weather normalization adjustment. Counsel for the Commission stated that Fink would testify on the subject and would make a specific recommendation to narrow the disparity between firm rates and interruptible rates. Counsel for the Company, after stating that the Company accepted all the adjustments made by the Staff accountants, acknowledged Fink's recommendation advocating "increasing the interruptible rate to take care of the weather adjustment" and indicated that rebuttal evidence would be introduced by the Company taking issue with Fink "as to who should bear the burden of the rate increase." The Assistant Attorney General, Division of Consumer Counsel, asserted that the Company's pre-filed evidence showed that it was trying to add high-priority firm customers, a result which would lessen the necessity for the proposed weather adjustment. The Assistant Attorney General reasoned that if the customer base was increased while the gas supply remained fairly constant, curtailment of service to interruptible customers might occur regardless of weather. He suggested that these factors be considered by the Commission in determining the weather adjustment issue. Thus, in view of the substantial agreement between the expert witness presented by the Staff and the expert witness presented by the

Company as to the appropriate rate of return on equity, and the acceptance by the Company of the Staff's accounting adjustments, it is apparent that the only issues before the Commission were the weather adjustment and the rate of return on rate base.

Albert W. Buckley, the Company's President, whose testimony was principally directed to cost of capital, stated on cross-examination that the Company was endeavoring to add residential and high-priority commercial customers and that he expected the customer mix in the future to become more heavily residential.

Frank A. Farmer, the Company's Vice-President-Operations, admitted on cross-examination that the Company had made no studies in connection with the proceeding to support its assumption that the average of the gas sold in June, July and August represented the monthly basic requirements of firm customers, although he said that the Company had tested the average with individual customers and had found it to reflect the base load. He volunteered that base load was referred to by some as the water-heating load or the cooking load, but these loads were also weather-sensitive, because lower ground temperature in winter necessitates the use of more gas to heat water or to cook. Farmer testified that the Company's air conditioning load was "infinitesimal" and did not affect the result. He maintained that the Company had already done what Fink recommended by analyzing the market and allocating the major part of the proposed rate increase to firm industrial and commercial customers and interruptible users. He felt that the proposed interruptible rate was all that this class of customers would tolerate without changing to alternate fuels. Conceding that the Company was taking on additional high-priority customers, Farmer said that the "whole load picture" was changing "drastically", because of conservation efforts by commercial, industrial and interruptible customers. He estimated that reduction in usage by high-priority customers would cause the total volume of sales to such customers to remain fairly constant for the foreseeable future.

Fink amplified his pre-filed testimony and recommended denial of the weather adjustment as proposed. He testified that for the test year ending February 28, 1978, which originally had been suggested, the total degree days were 4563, rather than 4815, the total for the test year ending March 31, 1978, actually used by the Commission. This change of only one month in the period covered by the test year increased the degree days by 252 and caused the

Company to request an adjustment for an additional reduction in revenues of $124,038 for a total of $234,182. This example, Fink said, showed the effect of weather upon revenues when the supply of gas remains constant and there is a difference between firm rates and interruptible rates. Increasing interruptible rates to a point almost as high as the lowest firm rate would tend to reduce, but not eliminate, the fluctuation in revenues caused by fluctuations in weather. He recommended that the Commission authorize the Company to increase interruptible rates to recapture part, but not all, of the deficiency. He conceded that he had made no study of the effect of such an increase on the interruptible market and that the amount of the increase, not exceeding his recommended maximum, must be a management decision.

Buckley, recalled as a rebuttal witness on behalf of the Company, asserted that the Company fixed the proposed rate increases to stay competitive with suppliers of alternate fuels. He maintained that the Company could not increase the interruptible rate as Fink recommended without losing interruptible customers to competitors. At one time, Buckley said, the Company had 3400 to 4000 customers who discontinued service during the summer months and reconnected later, but he thought that the number of customers who took such action was now substantially lower.

By its Order and Opinion entered July 31, 1978, the Commission ruled that the Company should be allowed a return of 9.82% on the test year rate base of $15,282,879 reported by the Staff, accepted by the Company, and adopted by the Commission. To achieve this result the Company was ordered to file tariff revisions designed to increase revenues on an annual basis by a sum not to exceed $664,784. The Commission expressly rejected the weather normalization adjustment in the following language:

> The Commission cannot accept the weather adjustment as proposed by Company. The assumptions made in its calculation of the basic requirements of firm customers appear too speculative. They are not based upon any studies and, consequently, the adjustment is unsupported by adequate evidence. Accordingly, we find Company's proposed $234,182 adjustment to revenues should be denied.

The Company filed a Petition for Reconsideration seeking to have the Commission reopen the proceeding and permit the

Company to increase its rates and charges to recover the anticipated revenue deficiencies resulting from denial of the weather adjustment. Attached to the Petition were calculations and work papers showing in detail the manner in which the proposed adjustment had been computed. These computations had not been introduced into evidence, the Company asserted, because they were available to the Commission Staff for review, and there had been no disagreement between Company and Staff as to the methodology used or the amount of the proposed adjustment. The Petition for Reconsideration was not approved by the Commission, and the Order and Opinion entered July 31, 1978, remained unchanged.

On appeal, the position of the Company is that, as the Company and the Staff accountants had agreed on the amount of the weather adjustment, and even Fink, the Staff engineer, had agreed with the manner in which it was computed, no evidence was required to support the adjustment. The Commission having approved weather normalization adjustments in other cases was therefore required, the Company says, to approve such an adjustment in the present case. As we understand the Company's argument, the Commission had the duty to adopt either the weather adjustment proposed by the Company and accepted by the Staff accountants, or the alternative proposed by Fink but opposed by the Company.

We do not accept such a restrictive view of the powers and functions of the Commission. The responsibility for regulating the rates of public service companies is vested in the Commission under the provisions of Article IX of the Constitution of Virginia and Virginia Code § 12.1-12, and employees, appointed or employed by authority of Code § 12.1-18, merely assist the Commission in the discharge of its duties. Therefore, any accounting adjustments proposed or accepted by the Commission Staff can be no more than recommendations to be adopted or rejected by the Commission, and no acceptance by the Company of staff adjustments can bind the Commission. Such acceptance cannot be equated with a stipulation entered into by parties to litigation in a court of record to establish a fact without adducing evidence to prove it. Fink's express opposition to the proposed adjustment was fair warning to the Company that the matter was controversial and had not been agreed to by the Staff. As the final decision on adjustments is made by the Commission, an applicant for rate relief has the burden of persuading the Commission that the

application, including proposed adjustments, is meritorious. Code § 56-235.3. There was no obligation on the part of the Commission to warn the Company during the hearing that the proposed adjustment was not adequately supported by evidence. The risk of non-persuasion remains with the applicant. Nor was there any obligation on the part of the Commission to object to the proposed adjustment during the proceeding. The proposed adjustment was a part of the record that was before the Commission for consideration and evaluation.

█ Ratemaking decisions of the Commission are prima facie just, reasonable, and correct. *See Appalachian Pow. Co. v. Commonwealth*, 216 Va. 617, 625-26, 221 S.E.2d 872, 878 (1976). Nevertheless, while a decision involving the Commission's legislative expertise is presumptively correct, *Apartment House Council v. PEPCO*, 215 Va. 291, 293, 208 S.E.2d 764, 765-66 (1974), a factual determination made by the Commission must have some evidentiary basis. *See Mutual Savings v. Commonwealth*, 212 Va. 557, 186 S.E.2d 13 (1972). However, Code § 56-235.2,[2] enacted into law by Chapter 336 of the 1977 Acts of the General Assembly, specifically prohibits the Commission from considering any adjustments that are speculative or that cannot be predicted with reasonable certainty. This statutory enactment refines the principle long approved by us that adjustments to test year results for known changes are always permissible. *Commonwealth v. VEPCO*, 211 Va. 758, 771, 180 S.E.2d 675, 685 (1971).

█ Weather normalization adjustments have been recognized by public utility regulatory bodies elsewhere, *e.g., Boston Gas Co. v. Department of Public Utilities*, 368 Mass. 780, 336 N.E.2d 713

---

[2]Code § 56-235.2 (Cum. Supp. 1978) provides:
Any rate, toll, charge or schedule of any public utility operating in this State shall be considered to be just and reasonable only if: (1) the Public utility has demonstrated that such rates, tolls, charges or schedules in the aggregate provide revenues not in excess of the aggregate actual costs incurred by the public utility in serving customers within the jurisdiction of the Commission, subject to such normalization for nonrecurring costs and adjustments for known future increases in costs as the Commission may deem reasonable, and a fair return on the public utility's rate base used to serve those jurisdictional customers; and (2) the public utility has demonstrated that such rates, tolls, charges or schedules contain reasonable classifications of customers. In determining costs of service, the Commission may use the test year method of estimating revenue needs, but shall not consider any adjustments or expenses that are speculative or cannot be predicted with reasonable certainty. In any Commission order establishing a fair and reasonable rate of return for an investor-owned gas, telephone or electric public utility, the Commission shall set forth the findings of fact and conclusions of law upon which such order is based.

(1975), and by the Commission. In two recent cases, *Application of Virginia Pipe Line Company, et al.,* 1977 S.C.C. Ann. Rept.      , and *Application of Washington Gas Light Company,* 1978 S.C.C. Ann. Rept.      , the Commission approved weather normalization adjustments. Indeed, in the *Washington Gas Light Company* case, in which the test year was the same as in the present case, the Commission in its Findings and Final Order made the general statement that such an adjustment is proper, at least where the record contains sufficient evidence to warrant the use of a particular method of adjustment. The Commission also acknowledged that most Virginia gas utilities make weather normalization adjustments if the weather for the test year is abnormal. In that case, the Commission, after reviewing certain undisputed adjustments, unrelated to weather, made by the Staff and accepted by the applicant, expressly approved these adjustments, thus confirming the tentative nature of such adjustments prior to Commission action.

In both cases where the Commission allowed weather adjustments, reference was made to supporting studies. In its Findings and Final Order in the *Washington Gas Light Company* case the Commission set forth some of the expert testimony that explicated the studies. Those cases were not appealed to us, the records are not before us, and we are unable to determine whether the Commission has taken an inconsistent and arbitrary position in denying the proposed weather adjustment in the present case when it has approved the adjustments in the other cases. Approval of the general principle of weather normalization and approval of specific weather adjustments in other cases do not mandate approval of such an adjustment in the present case, which must stand or fall on its own record.

In the present case, the Commission did not find fault with the manner in which the proposed weather adjustment was computed, but found that the basic assumptions upon which the computations were made were speculative, were not based upon studies, and thus were not supported by sufficient evidence. The Commission was not satisfied with the assumption, made without the benefit of studies prepared to support this application, that the average gas usage by firm customers during the three summer months accurately reflected the basic gas requirements of the Company's firm customers. The Company's witness Farmer conceded that such studies were not made, although he testified that

the Company constantly studied its base load, and had determined from comparisons made with individual customers that the average reflected the base load. Because certain businesses shut down in July, the gas requirements of firm customers for that month were lower than the average monthly base load and for "varying reasons" Farmer said that requirements for June and August were "slightly" higher than the average monthly base load. But no studies supported these general statements or Farmer's further comment that the Company's air-conditioning load was inconsequential.

Moreover, there was evidence that the Company's load structure was changing significantly, that firm customers were being added, that firm customers were reducing their gas consumption to conserve energy, and that the supply of gas, while relatively unchanged in 1978, was expected to increase in 1979 and thereafter. In the light of these variables we cannot say that the Commission acted arbitrarily or capriciously in denying the proposed weather adjustment in the absence of hard evidence based upon load studies of the basic gas requirements for the test year.

The Commission also failed to accept Fink's recommendation that the interruptible rate be increased to enable the Company to recapture a part of the benefit incorporated in the proposed weather adjustment. However, two of the principal officers of the Company testified that this recommendation could not be approved without jeopardizing the interruptible market which generated as much as one-third of the Company's revenues. Having adduced the evidence, the Company may not complain if it was persuasive. Rejection of the weather adjustment did not require the Commission to approve Fink's alternative proposal, and rejection of Fink's proposal did not require approval of a weather adjustment.

█ Finally, we hold that the Commission did not abuse its discretion in declining to grant the Company's Petition for Reconsideration. Since there were no studies to support the Company's assumptions as to basic gas requirements, there was no additional evidence of consequence to be produced. The Company proffered more detailed computations to show the breakdown of basic gas use by categories of firm customers, but the computations were not what concerned the Commission, only the assumptions upon which the computations were predicated.

In summary, the Commission decided a question involving the weight and sufficiency of the evidence. As we cannot say as a matter of law that the decision was incorrect, we will affirm it.

*Affirmed.*