# Richmond

LAKE OF THE WOODS UTILITY COMPANY, etc.

v.

STATE CORPORATION COMMISSION, etc.

January 22, 1982.

Records Nos. 810785
and 811206.

Present: Carrico, C.J., Cochran, Poff, Compton, Thompson, and Stephenson, JJ., and
Harrison, Retired Justice.

*John W. Riely (Caroline Page O'Neill; Hunton & Williams,* on briefs), for appellant. (Record No. 810785)

*Atwell W. Somerville; Kenworth E. Lion, Jr. (Lewis S. Minter; Somerville, Moore & Joyner, Ltd.,* on briefs), for appellees. (Record No. 810785)

*Atwell W. Somerville (Somerville, Moore & Joyner, Ltd.,* on brief), for appellant. (Record No. 811206)

*John W. Riely (Caroline Page O'Neill; Lewis S. Minter; Hunton & Williams,* on brief), for appellees. (Record No. 811206)

COMPTON, J., delivered the opinion of the Court.

In this appeal of right, a public utility that provides water and sewer service only to a residential subdivision complains of the action of the State Corporation Commission in denying a portion of a requested sewer rate increase. The public service company as-

serts (1) that the action of the Commission deprives the company of its property without due process of law and (2) that the Commission's refusal, during the rate determination, to approve numerous items proposed as part of the company's operating costs constituted an abuse of the Commission's legislative discretion. We disagree with the utility on both counts and affirm the Commission.

In June of 1980, appellant Lake of the Woods Utility Company instituted this proceeding by filing with the Commission an application under Code § 56-245 for a temporary emergency increase in rates for sewer service. The Company sought to revise its tariffs to raise the monthly charge to residential customers from $8 to $24, thus increasing gross annual revenues by $147,648. The Company stated its net operating income from the sewer service during the twelve months of 1979 was a loss of $205,698.

In July of 1980, the Commission denied the request for emergency relief, set a public hearing for November of 1980 to receive evidence on the proposed tariff revision, and directed its staff to investigate the appropriateness of interim relief under Code § 56-240. Subsequently, the Commission determined the Company had demonstrated that an increase in gross annual revenues of $147,648 would be justified after a full hearing. Thus, the Company was permitted to collect those revenues on an interim basis, subject to refund, for service rendered on and after August 1, 1980.

Then on July 29, 1980, the Company filed a revised schedule for a monthly charge of $40 designed to increase its gross annual revenues by another $147,648, in addition to the amount to be received through the interim rate.

The Commission referred the matter to a Hearing Examiner, who presided over the hearing on November 5. Subsequent to the hearing the Company, upon request of the Examiner, submitted additional data in January of 1981 and the Examiner filed his report in February. The Examiner found that certain proposed expense items should be either denied entirely or approved only in part. He also determined that the Company's net operating loss for the test year ending December 31, 1979 was only $110,428, that "no return on rate base [was] appropriate for this Company," and that permitting the utility to earn additional revenue sufficient to cover the foregoing loss would "constitute fully adequate, just and reasonable rate relief in this case." The Examiner also found

that the Company's gross additional revenue requirement based on test year operations was $114,671 and that the Company should be allowed, *inter alia,* to put rates in effect designed to produce that amount of additional revenue; the rate so designed is $20.43 per month.

Filing exceptions in March of 1981 to the Examiner's Report were the Company and Lake of the Woods Association, an organization of the subdivision property owners that entered the proceeding as a Protestant. The Association asked the Commission to find that a monthly sewer charge of $9.48 is adequate to permit the Company to recover its justifiable operating expenses, or, in the alternative, to set a maximum rate of $12.

In the order appealed from filed April 1, 1981, supplemented later by a written opinion, the Commission unanimously adopted the Hearing Examiner's findings and required the Company to file revised tariffs and a proposed refund plan. The operation of the final order was suspended pending this appeal, thus leaving in effect the interim rates permitted by the Commission effective August 1, 1980.

The Association has appeared before us both as an appellant and appellee. Because the Association asserts as appellant it "is willing to accept the decision of the Commission" in the event of an affirmance, it is unnecessary for us to address further the Association's argument on its appeal.

The facts are undisputed. Lake of the Woods is a 2600-acre residential subdivision in Orange County consisting of approximately 4200 lots around a 500-acre lake. Development of the property began in 1967. All the lots have been sold and about 800 have been improved with dwellings. About 75 percent of the homes are occupied full time. In the recent past, new homes have been added to the subdivision at the rate of about 70 per year. There is little commercial development. The community, improved by hard surfaced roads, has numerous common use facilities such as swimming pools, a community building, a golf course, parks, playgrounds, and picnic areas. The Association operates and maintains these common use facilities.

Lake of the Woods Utility Company provides water and sewer services to the community. At the end of the test year, December 31, 1979, there were 769 customers receiving service from the Company, and all but three used both water and sewer services.

These three had their own septic tank systems and purchased only water service.

The Company is a wholly owned subsidiary of AtPac Land Company of Santa Barbara, California. AtPac purchased the stock of the Company in late 1978 or early 1979 as one of a number of acquisitions from Boise Cascade Home and Land Corporation.

The water service provided by the Company is supplied by a conventional system of wells, storage tanks, and mains. No request for an increase in water rates has been made by the Company in this proceeding. Those rates have not been increased since commencement of water service in 1967. Customers who own lots but do not take water service are obligated to pay a water "availability charge" of $4 per month.

The sewer service, begun in 1969, is provided by an unusual vacuum system, used by only about six sewer companies in the United States. The soil in the area is not suited for individual septic tank systems and the hilly terrain prevented use of a conventional gravity flow sewer system. In the system used, sewage discharged from a residence flows by gravity to a nearby holding tank, usually shared by one other home. Vacuum pressure then pulls the sewage from the holding tank to one of 13 pumping stations. The substance then is pumped through a sewage force main into a larger gravity flow main connected to the sewage treatment plant.

At the time of the hearing, the system employed nearly 300 electrically operated holding tank valves designed to open at appropriate times to allow the force of the vacuum to empty the tank. New valves currently installed are operated pneumatically without the need of electric power. Malfunctions frequently occur at the storage tanks resulting in overflowing tanks that must be pumped out by crews of workers with a tank truck. The Examiner found the entire system to be "labor and energy intensive."

Under the proposed revised schedule, the Company's requested 400 percent increase in basic sewer rates should cause a 116 percent increase in gross annual revenue, according to a Commission Staff accountant. No change was requested in a $3.75 per month sewer "availability charge," but the amended application sought increase in the sewer connection and installation fees to a total of $1450.

At the hearing stage, the Association and the Attorney General of Virginia, who appeared before the Commission pursuant to Code § 2.1-133.1(a) to represent consumers' interests, urged the Commission to examine the Company's financial condition on a "total company basis," instead of reviewing only the sewer phase of the Company's business as proposed in the Company's application. The Commission noted that the water and sewer systems serve virtually the same customers and that the two systems are maintained by the same personnel. Thus, the Commission concluded it would "be logical and eminently more fair to both Company and its customers, to determine Company's revenue requirements on a total Company basis." The Commission, however, concluded there was insufficient evidence in the record to employ that technique in this proceeding because the Company's water operations, and the allocation of the "availability charges" between water and sewer, received little or no analysis from either the Commission Staff or the parties.

Consequently, and focusing on the Company's sewer operations alone, the Commission found that the requested rate increase was "exorbitant" from the consumer's standpoint and that such an increase would be "devastating" to the Lake of the Woods community. The evidence showed that the interim rates and the pendency of this proceeding had a "depressing effect" on the continuing efforts to develop the subdivision and on the availability of mortgage money to finance residential construction. The record shows that the proposed rates are significantly higher than those in nearby areas and would probably make Lake of the Woods unattractive to prospective purchasers as well as discourage the present lot owners from building. The Commission also found that the Company's "viability" is tied to the vitality of the subdivision and that rates which "strangle" growth, or cause an exodus of property owners, will not benefit the utility.

The Commission determined, *inter alia,* that the sewer system is "overbuilt in relation to the present customers' needs"; that the Company is overstaffed, inefficient, renders poor service and makes excessive, questionable use of the assistance of affiliated companies and a California consulting firm; and that the Company lacks on-site management personnel, which contributes to its other "problems."

The Commission decided, therefore, that the utility should be authorized to revise its sewer tariffs to produce additional net rev-

enues in the amount recommended by the Hearing Examiner. It concluded:

"This will allow Company to 'break-even' based on the adjusted test year results but will not provide for a return on the questionable amount of Company's investment. Actually we entertain considerable fears that permitting a 'break-even' result in this case may be somewhat generous. The impact on consumers of rates designed to produce this effect will still be burdensome, an increase from $8.00 per month to $20.43 per month. Nevertheless, based on the evidence in this record, we believe that such a finding strikes a reasonable balance between the interests of the consumer and Company."

On appeal, the Company argues that by "authorizing a rate designed to produce a 'break-even' result here, the Commission is forcing the Company to continue to expend resources in providing utility service to the public without receiving any return whatsoever on its investment." Such a result, the Company urges, amounts to confiscation and thus deprives the utility of its property without due process of law.

The Company says "[i]t is axiomatic that a utility is entitled to earn a return on its investment." It asserts the Commission "has a duty to fix some rate of return" and "does not have the option of denying a return altogether." We fully agree with the Company's recitation of the foregoing truisms of public utility regulation when applied in the proper context. But the Company has overstated its case here.

The mere fact that the Commission has determined that the rate charged sewer customers should not include any return on the sewerage portion of the Company's rate base does not establish confiscation when, as here, the utility furnishes both water and sewer service, and the blended operation is profitable. The record shows that the combined operations of the Company have the same stockholders, the same management, the same administrative personnel, the same maintenance personnel, and essentially the same customers. As the Commission points out on brief, the Company "agrees that its water and sewerage operations are a single, profit seeking enterprise." In one of its appellate briefs, the utility states:

"The Company is interested in adequate revenues, not the source of the revenues. If the Commission will authorize adequate revenues for the Company, they can, so far as the Company is concerned, be allocated between the two services in any fashion that the Commission elects or, in fact, can all be imposed on one service and the other service rendered without charge."

The Company's own figures demonstrate it is profitable. According to the utility's accounting evidence for its water operations, considered with the "break-even" sewer rate fixed by the Commission in this proceeding, the Company is authorized to earn a net operating income of $71,608. Also, based on the Company's own figures the water operations are earning a return of 13.17 percent. With the new sewer rate, the entire Company is earning a return of 2.97 percent. On these facts, the utility may not successfully demonstrate confiscation on the sole basis that the Commission did not fix a rate of return for the sewerage portion of its rate base. Confiscation must be proved with reference to the utility's entire rate base, defined as the value of a utility's property used and useful in providing its service, *Howell* v. *Chesapeake and Potomac Tel. Co. of Va.,* 215 Va. 549, 558, 211 S.E.2d 265, 271 (1975), and not with regard to only a portion of its total investment. *See Alabama Public Service Commission* v. *Southern Railway Co.,* 341 U.S. 341, 352 (1951) (concurring opinion); *Puget Sound Traction Co.* v. *Reynolds,* 244 U.S. 574, 580-81 (1917).

The foregoing principle was codified by the General Assembly with the enactment of Code § 56-235.2, which provides in pertinent part:

"Any rate, toll, charge or schedule of any public utility operating in this State shall be considered to be just and reasonable only if: (1) the public utility has demonstrated that such rates, tolls, charges or schedules *in the aggregate* provide revenues not in excess *of the aggregate* actual costs incurred by the public utility in serving customers within the jurisdiction of the Commission, subject to such normalization for nonrecurring costs and adjustments for known future increases in costs as the Commission may deem reasonable, *and a fair*

*return on the public utility's rate base* used to serve those jurisdictional customers; . . . ." (emphasis added).

Consequently, reasonableness of public utility rates must be examined on the basis of aggregate revenues, aggregate costs, appropriate adjustments, and a fair return on the utility's total rate base. Likewise, proof of a utility's claim of confiscation must be based on an examination of the same aggregate and total criteria. This the Company has not done here, focusing instead on only a portion of the Company's total operation. Thus, we reject the utility's constitutional argument.

The Company also attacks the decision below on the ground that the Commission's determination to disallow several categories of the Company's operating expenses was arbitrary, unsupported by the evidence, and constituted an abuse of the Commission's discretion.

The utility objects, first, to the Commission's action in limiting the rate case expense to $3,000 when the Company proposed an allowance of $28,000, to be amortized over four years at $7,000 per year. Company witness, Robert L. Frasher, an accountant with Brockmeier Consulting Engineers, Incorporated, the California consulting firm retained by the utility, testified that the $28,000 was an "estimate" that was to include the time devoted to this proceeding by the Brockmeier firm, "the attorney's cost and any cost that would be incurred by any of the other parties." He also stated that his firm's time spent on the case "will approximate twenty-five thousand dollars." A Commission Staff witness testified the Company had "booked" $19,640 for rate case expense as of August 31, 1980, and that he assumed the expense would equal $28,000 "before this case is concluded."

The Commission ruled the proposed allowance for the cost was "excessive." Pointing out the suggested sum exceeds 11 percent of the sewer operations adjusted test year revenues as calculated by a Staff witness, the Commission properly noted that it was "not required to impose upon the ratepayers whatever a company might choose to spend for legal and accounting assistance in connection with a rate case." The Commission found that the consulting firm "merely prepared some very generalized accounting testimony . . . for which it expects to be paid $25,000 over and above the $15,000 annual retainer already charged by the firm." The Commission further said that Frasher's testimony was "of limited

value," and stated "we fail to see why it was necessary for his firm to participate in this case."

While the Commission may not assume the duties or usurp the powers of utility management, the regulatory body has a reasonable discretion to disallow any part of expenses actually incurred where the evidence shows such expenses are exorbitant, unnecessary, wasteful, or extravagant. *Norfolk* v. *Chesapeake and Potomac Tel. Co. of Virginia,* 192 Va. 292, 311-12, 64 S.E.2d 772, 783-84 (1951). Upon an analysis of the evidence pertaining to this expense for services rendered by a California consulting firm to this small Virginia utility, we cannot conclude the Commission abused its discretion in disapproving the item.

■ We likewise reject the Company's complaint that the Commission erred in eliminating "all expenses for management services provided by the Company's affiliates." The Commission disallowed the Company's expenses incurred as the result of services rendered by several out-of-state companies that were affiliated with this utility, an enterprise that has only 15 on-site employees and less than 800 active customers. The affiliates rendered such sophisticated services as administration of employee benefit plans, administration of employee insurance plans, budget review, and day-to-day administrative and accounting assistance. We hold the Commission properly disallowed these expenses consistent with its statutory duties, first, to examine and approve a public service company's relations with affiliate interests, Code § 56-76 to -87, and, second, to exclude in whole or in part from the utility's accounts any payment to an affiliated interest for services rendered that is not consistent with the public interest. Code § 56-78. The Commission's decision on this item of expense was fully supported by the evidence.

■ We also disagree with the Company's argument that the Commission erred by rejecting the utility's proposed increase in operating expenses by $26,583 for increased cost of electric power. The Commission Staff made an electricity expense adjustment in a larger amount but labelled it a "Company projection." The Company based its calculations upon two assumptions that the Commission found "arbitrary and without justification": (1) that the utility's power usage will remain the same in the future as during the test year, and (2) that the electric rates used by the Company in making its calculation are representative of the future. The Commission pointed out the projection was not based

upon a factual study and was not an "annualization of. . .[a] known rate increase." Adjustments to test year results for known charges are proper, *Roanoke Gas Co.* v. *Division of Consumer Counsel,* 219 Va. 1072, 1080, 254 S.E.2d 102, 107 (1979), but adjustments that are "speculative or cannot be predicted with reasonable certainty" are prohibited. Code § 56-235.2. We cannot say the Commission acted arbitrarily in denying the foregoing adjustment in the absence of a definitive evidentiary basis for the Company's calculations.

■ Finally, we also reject the Company's argument that the Commission incorrectly limited the Company's uncollectable sewer accounts expense to one percent of gross annual sewer revenues. The Company's books reflected a test-year uncollectable accounts expense for sewer operations of $23,924. Letters had been written to the delinquent customers without success; formal legal action had never been used to collect the debts. Most of the delinquents were "availability" customers who had no service that could be terminated for nonpayment of charges.

The Commission endorsed the policy of its Staff, based on experience with other utilities, by allowing a "bad debt" expense of one percent of revenues, thus decreasing the Company's expense item by $21,403. Pointing out that "bad debts are a fact of business life," the Commission said that in ratemaking "we are not bound to recognize Company's actual bad debt experience, but only a sum which we find reasonable." The Commission also stated that the utility has the burden to prove it is entitled "to a level of bad debt expenses greater than that experienced by most utilities" and that because the Company had made "only a minimal attempt to collect delinquent accounts," the burden of proof had not been met to the Commission's satisfaction. We think this action was a proper exercise of the Commission's discretion.

For the foregoing reasons, the order appealed from will be affirmed. The proceeding will be remanded for such further action by the Commission as may be necessary to implement this decision.

*Affirmed and remanded.*